1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **EASTERN DISTRICT OF CALIFORNIA**

9

10

11

| | |
|---|---|
| PAMELA MARIE DEACON, | Case No.: 1:21-cv-00641-BAM |
| Plaintiff, | **ORDER REGARDING SOCIAL SECURITY COMPLAINT** |
| v. | (Docs. 15, 18) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiff Pamela Marie Deacon ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe.[2]

---

[1]    Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

[2]    The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, including entry of final judgment, pursuant to 28 U.S.C. § 636(c).  (Docs. 4, 7, 8.)

Having considered the briefing and record in this matter, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards.  Accordingly, this Court affirms the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff protectively filed an application for disability insurance benefits on January 4, 2018.  AR 291-92, 293-94.[3]  Plaintiff alleged that she became disabled on December 8, 2017, due to dysautonomia, fibromyalgia, hiatal hernia, idiopathic ventricular tachycardia, moderate asthma, edema, stage 2 kidney failure, mitral valve prolapse, chronic migraines, irritable bowel syndrome, vasal vagal syncope, de Quervain Syndrome, carpal tunnel in both hands, and cubital tunnel.  AR 323-24.  Plaintiff's application was denied initially and on reconsideration.  AR 141-45, 150-54.  Subsequently, Plaintiff requested a hearing before an ALJ.  ALJ Diane Davis held a hearing May 26, 2020.  AR 34-77.  ALJ Davis issued an order denying benefits on September 1, 2020.  AR 7-27.  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied, making the ALJ's decision the Commissioner's final decision.  AR 1-5.  This appeal followed.

### Hearing Testimony

The ALJ held a telephonic hearing on May 26, 2020.  Plaintiff appeared at the hearing with her attorney, James Yoro.   AR 35, 39.  Dr. Dennis Duffin, an impartial vocational expert, also appeared and testified.  AR 39.

In response to questions from her attorney, Plaintiff testified that she earned an associate degree as a paralegal.  She last worked in December 2017 and has not worked in any capacity since that time.  AR 43-44.  She stopped working due to her cardiac issues and her fibromyalgia.  In addition, she had a Worker's Compensation case based on injury to her bilateral hands, wrists and elbows.  She has had medical treatment and numerous surgeries on the right hand and surgery on the left hand and elbow.  AR 44-45.

---

[3]     References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

At the time she stopped working, she was a child support officer for the County of Kern.  Her job responsibilities included establishing court orders for child support and seeing customers all day long.  She was sedentary most of the day with constant typing and writing.  In the last two years or work, her health declined dramatically, especially after she hurt her hand.  A year prior to filing her Worker's Compensation claim, she saw a doctor for trouble with her right thumb, which he said was work related.  However, she continued to work until she had surgery on her right hand in December 2016.  She did not have left hand, wrist and elbow surgery until two years later.  She did not return to work after her first surgery in December 2016 because she had a second surgery.  After the second surgery, she returned to work in a modified position as a receptionist, but her job was not modified as recommended by her Worker's Compensation doctor.  Instead, she was constantly working eight hours, except for a 15-minute break in the morning, a 15-minute break in the afternoon and her lunch.  She continued the same job even after her surgery, despite the work restrictions.  AR 45-48.

During that time, her cardiac issues started worsening and she started having fibromyalgia flares.  This had an effect on her ability to stay on the job and she was actually off work more than she was on.  Her doctor pulled her off of work.  He restricted her to no more than four hours total in an 8-hour workday, but she was not able able to get any modification from the county that would allow for that.  AR 48-49.

Plaintiff testified that she also was diagnosed with severe debilitating neurocardiogenic syncope and POTS.  Plaintiff explained that the blood pools at her feet and she does not have a regular circulatory system that pushes the blood back up to her heart.  This causes dizziness, lightheadedness, and extreme fatigue, and she is prone to falls.  AR 49-50.

Plaintiff further testified that she is in constant pain from the fibromyalgia.  She has flares that can last a couple of days or weeks.  She takes daily medication for it.  She sees a chronic pain management specialist for her hands and one for her back issues and general fibromyalgia control.  She also suffers from chronic migraines.  She sees a neurologist and she has suffered mini strokes from her migraines. AR 50-51.

When asked how her medical conditions affect her ability to function, Plaintiff testified that there are a lot of things that she cannot do any longer and she has to have a lot of help from her

family.  AR 51.  She believed that she could not function at a sustained activity level more than four hours in a day because she constantly has to rest.  She also has no grip strength, drops things constantly, and can only lift a gallon of milk.  AR 51-52.

When asked about her medication, Plaintiff testified that she takes a narcotic medication, Norco.  It makes her sleepy and nauseous.  It also affects her ability to focus and concentrate.  She still has a valid driver's license, but she has to be careful because of the dizziness.  AR 52-53.

Plaintiff further testified that her condition has worsened since she stopped working.  She had more attacks with the dysautonomia and POTS.  She also needs one more surgery on her right hand and elbow.  Surgery has been postponed in the past because her cardiologist did not have a cardiac plan.  AR 53-54.

When asked to describe a typical day, Plaintiff testified that she has doctor's appointments and she watches TV and movies, reads and prepares simple meals.  She gets very tired in the afternoons and lies down.  She will usually sleep for about an hour.  She lives with her husband and 17-year-old daughter.  Her husband works full time.  Her daughter helps a little with activities of daily living, but she has mental issues and is not a full-functioning 17-year-old.  AR 54-55.

In response to questions from the ALJ, Plaintiff testified that her Worker's Compensation case had settled, and her surgery will be paid for as part of that settlement.  Plaintiff explained that when she returned to work after her surgeries, she worked as a receptionist, but they returned her to a full-time child support position after five months, which involved working on a computer all day.  When working at the receptionist position, she was greeting clients and notifying staff when individuals arrived.  AR 55-58.

Plaintiff moved to Texas in 2019 because of her husband's job.  She has a Texas driver's license with no restrictions except to wear glasses.  AR 59-60.  Although she has a cardiologist in Texas, she kept her cardiologist in California and sees him once every six months.  She flies back to California by herself.  AR 61-.65.

Following Plaintiff's testimony, the ALJ elicited testimony from the VE.  The VE categorized Plaintiff's past work as child support officer and receptionist.  AR 67-68.  The ALJ also asked the VE hypotheticals.  For the first hypothetical, the ALJ asked the VE to assume an individual of the

claimant's age, education and work experience.  This individual could perform work at the light level of exertion and could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for about six hours total in an eight- hour workday and sit for more than six hours total in an eight-hour workday.  The individual could frequently push and/or pull with the bilateral upper extremities, could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds or work at unprotected heights.  The individual could frequently reach in all directions bilaterally, could tolerate occasional exposure to loud noise, excessive vibration and to atmospheric conditions.  The VE testified that such an individual could perform all of Plaintiff's past work.  AR 68-69.

For the second hypothetical, the ALJ added to the first hypothetical that the individual could frequently handle and finger bilaterally.  The VE confirmed that Plaintiff's past work would remain.  AR 69.

For the third hypothetical, the ALJ added to the second hypothetical a further restriction that the individual could not type for ten minutes every two hours.  The VE testified that based on his experience, the individual could perform Plaintiff's past work.  AR 69-70.

For the fourth hypothetical, the ALJ asked the VE to assume an individual of the claimant's age, education and work experience who could perform work at the light level of exertion and could stand for up to eight hours total in an eight-hour workday, walk for up to eight-hours in an eight-hour workday and sit for up to eight hours in an eight-hour workday.  This individual could bend, squat, climb and twist for up to eight hours total in an eight-hour workday, could reach in all directions for up to four hours total in an eight-hour workday, could grasp for up to four hours total in an eight-hour workday and could push and/or pull for up to four hours total in an eight-hour workday.  The individual could never crawl but could drive up to four hours total in an eight-hour workday, and could not lift, push, pull, grasp or torque over 15 pounds. The VE testified that the reaching and grasping limitations would eliminate Plaintiff's past work.  AR 70.  However, other work existed in the national economy for such an individual, such as furniture rental clerk, dealer account investigator, and usher.  AR 70-71.

If the ALJ added to the hypothetical that the work involved no climbing of ladders, ropes or scaffolds or working at unprotected heights, the VE testified that these jobs would remain. If the ALJ further added that the individual would be off task 15% or more in a workday, the VE testified that it would eliminate all competitive work. AR 71.

Following the ALJ's questions, Plaintiff's attorney asked the VE to consider the fourth hypothetical before the addition of the last limitation and add a limitation with respect to the bilateral upper extremities to include no repetitive manipulation of any kind for more than 30 minutes without a five-minute rest over four hours in an eight-hour workday. Repetitive motion would be for thirty minutes with a five-minute rest. The VE testified that if the individual could not do more than 30 minutes of repetitive motion, then it would eliminate those jobs. However, there would be a job with no manipulation at the light level - school bus monitor – and one at the sedentary level – surveillance system monitor. AR 72-73. The VE also confirmed that absence once a week would not be tolerated and would eliminate all competitive work. AR 74.

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act from December 8, 2017, through the date of the decision. AR 10-27. Specifically, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 8, 2017, her alleged onset date. AR 12-13. The ALJ identified the following severe impairments: bilateral cubital tunnel syndrome with release, bilateral carpal tunnel syndrome (CTS) with release, right de Quervain's with release, left first dorsal compartment release, dysautonomia, positional orthostatic tension syndrome, migraines, and fibromyalgia. AR 13-15. The ALJ determined that the severity of Plaintiff's impairments did not meet or equal any of the listed impairments. AR 16-17.

Based on a review of the entire record, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, including lifting and/or carrying 20 pounds

6

occasionally and 10 pounds frequently, standing and/or walking for about six hours total in an eight-hour workday, and sitting for more than six hours total in an eight-hour workday.  She could frequently push and/or pull with the bilateral upper extremities, could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds or work at unprotected heights, could frequently reach in all direction bilaterally, could frequently handle and finger bilaterally and could tolerate occasional exposure to loud noises, excessive vibration, and atmospheric conditions.  AR 17-26. With this RFC, the ALJ found that Plaintiff was capable of performing her past relevant work as a child support officer and receptionist.  AR 26-27.  The ALJ therefore concluded that Plaintiff had not been under a disability under the Social Security Act from December 8, 2017, through the date of the decision.  AR 27.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has

lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## DISCUSSION[4]

Plaintiff contends that the ALJ erred at step two of the sequential evaluation by concluding that certain of Plaintiff's impairments were non-severe impairments.  (Doc. 15 at 12.)  Plaintiff also contends that the ALJ erred at step three of the sequential evaluation by failing to properly determine whether she met or equaled a listed impairment.  Plaintiff further contends that the ALJ erred in the evaluation of the reports of her treating physicians, Drs. John Santaniello and Jared M. Salvo.  (*Id.* at 17.)  Finally, Plaintiff contends that the ALJ improperly discounted her symptom allegations.

### A.  Step Two Impairments

Plaintiff first argues that the ALJ erroneously concluded that certain of her impairments were non-severe at step two of the sequential evaluation.

At step two of the five-step sequential evaluation, the ALJ is required to determine whether a plaintiff has a "severe" medical impairment or combination of impairments. 20 C.F.R. § 404.1520(c). An impairment, or combination of impairments, can be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  *See* SSR 85–28, 1985 WL 56856 (Jan. 1, 1985); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988) (adopting SSR 85–28).  "The mere existence of an impairment is insufficient proof of a disability."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir.1993).  A claimant bears the burden of proving that an impairment is disabling.  *Id.* (citation omitted).

---

[4]     The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

"Step two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017), citing *Bowen v. Yuckert*, 482 U.S. 137, 146–47 (1987).  "It is not meant to identify the impairments that should be taken into account when determining the RFC . . . . The RFC . . . *should* be exactly the same regardless of whether certain impairments are considered 'severe' or not."  *Id.* (emphasis in original).  Any error in failing to include an impairment at step two is harmless if the ALJ considered any limitations imposed by the impairment in the RFC determination at step four.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4. As such, any error that the ALJ made in failing to include the bursitis at Step 2 was harmless.").

Here, at step two of the sequential evaluation, the ALJ found that Plaintiff's bilateral cubital tunnel syndrome with release, bilateral carpal tunnel syndrome with release, right de Quervain's with release, left first dorsal compartment release, dysautonomia, positional orthostatic tension syndrome ("POTS"), migraine and fibromyalgia were severe impairments.  AR 13.  Further, the ALJ found that multiple alleged impairments were not severe medically determinable impairments, including, but not limited to, bilateral shoulder strain, basal joint arthritis of the bilateral thumbs and right middle trigger finger, degenerative disc disease of the lumbar spine, hiatal hernia, asthma, stage II kidney failure, irritable bowel syndrome, Duane's syndrome of the right eye, allergies, chronic venous insufficiency, Raynaud's syndrome and hand tremor.  AR 13.

Although arguing that the ALJ erred at step two, Plaintiff does not identify which impairments she believes the ALJ erroneously determined were not severe impairments.[5]  Plaintiff asserts:

> When applying this narrow standard [at step two] to the evaluation conducted by the ALJ, the ALJ's conclusions are not supported by substantial medical evidence in the record. This is particularly true with respect to the opinions of Dr. Salvo, Dr. Alexan and the cardiovascular treaters. (Tr. 1455- 1460, 959 – 967, 1033 – 1058, 1387 – 1454)  All of these doctors outline the severity of the client's condition and indicate that additional restrictions are warranted beyond those imposed by the orthopedists.

(Doc. 15 at 12.)

---

[5] Plaintiff argues that all of non-severe medical impairments, "when considered in combination with the severe medically determinable impairments accepted by the ALJ significantly impact the Plaintiff's residual functional capacity."  (Doc. 15 at 4.)  This argument does not identify error at step two.

A review of the cited records shows that Dr. Jared M. Salvo variously assessed Plaintiff with POTS, neurocardiogenic syncope, dysautonomia orthostatic hypotension syndrome, labile hypertension, orthostatic hypotension, obesity, dizziness, bicuspid aortic valve, venous insufficiency, tachycardia, carpal tunnel syndrome, fatigue, palpitations, pre-syncope, neurocardiogenic pre-syncope, and anxiety.  AR 1388-91, 1392-96, 1397-1401, 1402-05, 1408-12, 1413-16, 1419-22, 1424-27, 1429-1432, 1433-36, 1437-40, 1441-45, 1449-52, 1456-60.  Dr Ajay Patel diagnosed Plaintiff with dysautonomia orthostatic hypotension syndrome, neurocardiogenic syncope, fibromyalgia, heart palpitations, and heart racing.  AR 1446-48.  Dr. Richard Alexan assessed Plaintiff with chronic migraine, migraine with aura, polypharmacy, history of convulsive syncope (suspect POTs – dysautonomia), dysautonomia, tremor – stress induced, fibromyalgia, Duane's syndrome of right eye, and depression.  AR 959-62, 1033-37, 1041-44, 1048-52.

Plaintiff does not identify which, if any of these impairments, were not found severe, but should have been.  Absent specific identification of the impairments that Plaintiff believes the ALJ should have found severe, the Court cannot conclude that the ALJ committed reversible error at step two.  The Court will not expend its scarce resources scouring the record to determine if one or more of Plaintiff's multiple alleged impairments was erroneously found to be a non-severe impairment. Indeed, the Court has no obligation to do so.  *See, e.g.*, *Duron v. Kijakazi*, No. 1:21-cv-00149-GSA, 2022 WL 3083735, at *9 (E.D. Cal. Aug. 3, 2022) (concluding court has no obligation to scan the record in search of inaccurate, incorrect or unsupported inferences).

In her reply brief, Plaintiff argues that the ALJ erred at step two with regard to her "cardiac impairments." (Doc. 20 at 3.)   Again, this general reference to "cardiac impairments" is not sufficient identification of the claimed error.  The Court recognizes that Plaintiff also cites to Dr. Salvo's opinion regarding Plaintiff's RFC, but this, too, lacks the necessary specificity given that Dr. Salvo identifies multiple diagnoses, including neurocardiogenic syncope, dysautonomia, POTS, and venous insufficiency.  AR 1456.  At least two of those identified diagnoses—dysautonomia and POTS—were found to be severe impairments by the ALJ.  AR 13.

Even assuming *arguendo* that the ALJ failed to find certain, unspecified cardiac impairment(s) severe at step two, any such error is harmless because the ALJ considered any

limitations imposed by Plaintiff's cardiac impairments at step four of the sequential evaluation. *Lewis*, 498 F.3d at 911.  For example, the ALJ considered Plaintiff's history of cardiac treatment, including for heart palpitations and near syncopal episodes, for which the ALJ included precautionary limitations in the RFC, including limiting her climbing and exposure to hazards, loud noise, vibration and atmospheric conditions.  AR 19.  Additionally, the ALJ considered Plaintiff's syncope, tachycardia, and venous insufficiency.  AR 19-20.  As to Plaintiff's purported challenge regarding the diagnoses in Dr. Salvo's RFC assessment, the ALJ specifically considered both Dr. Salvo's treatment records and his RFC assessment at step four of the sequential evaluation.  AR 24-25.  As discussed in greater detail below, the ALJ did not err in her evaluation of Dr. Salvo's RFC assessment and opinion.

Based on the foregoing, the Court finds that the ALJ did not commit reversible error at step two of the sequential evaluation.

**B.  Step Three**

Plaintiff next argues that the ALJ erred at step three of the sequential evaluation by concluding that her impairments did not meet or equal listing 1.02.  (Doc. 15 at 14.)

At step three, the ALJ determines whether "a claimant's impairment meets or equals an impairment listed in [20 C.F.R. part 404, subpart P, appendix 1]."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). The Listing of Impairments describes specific impairments of each of the major body systems "which are considered severe enough to prevent a person from doing any gainful activity." *Id.* (citing 20 C.F.R. § 404.1525).  If a claimant meets or equals a listed impairment he or she will be found disabled at this step without further inquiry. *Id.* (citing 20 C.F.R. § 404.1520(d)).

A claimant bears the burden of proving that his or her impairments satisfy all the criteria of a particular listing. *Id.*  "For a claimant to show that his [or her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). If a claimant's impairment or combination of impairments meets or exceeds a "listing," no specific finding is necessary as to the claimant's ability to perform his or her past relevant work or any other jobs. 20 C.F.R. § 404.1520(d).

Plaintiff contends that her impairments meet or equal 1.02.  Listing 1.02 for major dysfunction of a joint is characterized by:

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destructions, or ankylosis of the affected joint(s). With:

    A.  Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

    B.  Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand, resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 1.02.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of listing 1.02.  AR 16.  The ALJ reasoned as follows:

The claimant's impairments do not meet Listing 1.02 for major dysfunction of a joint because credible medical evidence does not show gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability), and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), with one of the following. A) Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting inability to ambulated effectively, as defined in 1.00B2b; Or B) Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.  The evidence of record does not document an inability to perform fine and gross movements effectively.

AR 16.

Plaintiff asserts that the ALJ erred by concluding there was no credible medical evidence showing gross anatomical deformity such as subluxation and chronic joint pain and stiffness with signs of limitation of motion.  Plaintiff asserts that the record is replete with references to subluxation, joint pain and joint stiffness.  (Doc. 15 at 14.)  Plaintiff's argument is not sufficient to demonstrate that the ALJ erred at step three by concluding that her impairments did not meet listing 1.02.  Plaintiff has failed to satisfy her burden to demonstrate that she met *all* of the specified medical

criteria for listing 1.02.  In particular, Plaintiff fails to demonstrate by citation to the medical record that she met the A or B requirements of listing 1.02, such as the inability to ambulate effectively or the inability to perform fine and gross movements effectively.  Moreover, Plaintiff does not challenge the ALJ's determination that the evidence of record did not document an inability to perform fine and gross movements effectively as required under the 1.02.B.  Indeed, Plaintiff has not referenced this finding or otherwise demonstrated how she meets this medical criterion.  (*See generally* Doc. 15.) The Court therefore cannot assign error.

Additionally, Plaintiff argues that the ALJ should have found that her impairments medically equaled the listing.  "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Tackett*, 180 F.3d at 1099 (quoting 20 C.F.R. § 416.1526); *see also Sullivan*, 493 U.S. at 531 (to establish equivalency, the claimant "must present medical findings equal in severity to all the criteria" for the listing (emphasis in original)). Plaintiff bears the burden of proof at step three. *Bowen*, 482 U.S. at 146 n.5.  Further, "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013) (quoting *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Plaintiff cites nothing to demonstrate that she presented evidence of equivalency to the ALJ, and the hearing transcript includes no such argument regarding equivalency.  (*See* AR 42-43.)  Plaintiff also does not cite evidence to the Court in an effort to establish equivalence.  (Doc. 15 at 14 -15.)

For these reasons, the Court finds that the ALJ did not commit reversible error at step three of the sequential evaluation.

C.    **Evaluation of Medical Opinion Evidence**

Plaintiff argues that the ALJ erred by giving greater weight to the opinions of the state agency medical consultants as opposed to those of her treating and examining physicians, Dr. John Santaniello and Dr. Salvo.  (Doc. 15 at 17.)

Because Plaintiff applied for benefits after March 27, 2017, her claim is governed by the agency's new regulations concerning how an ALJ must evaluate medical opinions.  20 C.F.R. §

404.1520c   Under the new regulations, the Commissioner does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The Commissioner evaluates the persuasiveness of the medical opinions based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(3)(1)-(5).  Supportability and consistency are the most important factors in determining persuasiveness.  20 C.F.R. § 404.1520c(b)(2).

Ninth Circuit case law preceding the new regulations afforded deference to the medical opinions of treating and examining physicians.  Indeed, prior to the current regulations, the Ninth Circuit required ALJs to provide clear and convincing or specific and legitimate reasons for rejecting the medical opinions of treating or examining physicians.  Contrary to Plaintiff's arguments, these standards of articulation no longer apply in light of the new regulations, and the ALJ is not required to provide "specific and legitimate reasons" to discount the medical opinions. *See Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (finding revised social security regulations "clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant").  The Ninth Circuit has clarified that "under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  *Id.*  "The agency must 'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [it] considered the supportability and consistency factors' in reaching these findings."  *Id.* (internal citations omitted).

Plaintiff asserts that the ALJ erred by affording greater weight to the opinions of the state agency consultants than those of her treating physicians.  (Doc. 15 at 16-17.)  Plaintiff's argument is not persuasive.  Under the applicable regulations, the ALJ was not required defer or give any specific evidentiary weight, including controlling weight, to Plaintiff's treating or examining physicians. 20

1   C.F.R. § 404.1520c(a).  Nevertheless, the Court considers Plaintiff's general assertion that the ALJ

2   erred in her evaluation of the medical opinions of Drs. Santaniello and Salvo.  (Doc. 15 at 17.)

3         Dr. Santaniello

4         Dr. Santaniello conducted an agreed medical evaluation in December 2016, prior to Plaintiff's

5   alleged onset date. AR 683-705, 706.  On physical examination, Plaintiff walked with a normal gait.

6   In her bilateral shoulders, she had tenderness over the trapezius and rhomboid muscles bilaterally, but

7   her range of motion was normal.  In her bilateral elbows, she had tenderness over the cubital tunnel

8   bilaterally, right greater than left, and tenderness over the medial epicondyle bilaterally, right greater

9   than left, but her range of motion was normal.  Her Tinel test was positive on the right, but all other

10  tests of her elbows were negative.  In her bilateral hands and wrists, Plaintiff had tenderness to light

11  touch over the incision area of the dorsal aspect of the right thumb and wrist and over the A1 pulley

12  right thumb.  She also had tenderness over the first extensor compartment of the left wrist, tenderness

13  over the CMC joint of the bilateral thumbs and tenderness over the A1 pulley of the right middle

14  finger.  Range of motion in her bilateral hands was normal with no evidence of catching on

15  flexion/extension of the fingers. Grip strength testing revealed a flat response bilaterally.  Durkan test

16  of the bilateral wrists was positive. Finkelstein test also was positive bilaterally.  Grind test was

17  negative on the right and positive on the left.  AR 697-700.

18        Based on this evaluation, Dr. Santaniello opined that Plaintiff would be allowed to continue to

19  do her usual and customary duties, but she required rest periods during the course of the workday:

20  "From 9 to 9:10 no typing.  She has a break from 10:10 to 10:25. From 11.25 to 11:35 no typing.  She

21  has lunch from 12:30 to 1:30. From 2:20 to 2:40 no typing.  From 3:40 to 3:55 there is a break."  AR

22  704, 706.

23        The ALJ found this opinion "persuasive overall," explaining:

24     The immediate examination findings, including positive Tinel's test bilaterally and
       tenderness to palpitation, but normal ROM in the bilateral hands, and normal ROM and
25     stability in the bilateral shoulders, generally supports these opinions.  Furthermore, these
       examination findings are generally consistent with the overall treatment record, showing
26     positive tests for carpal tunnel and cubital tunnel syndrome, but only mild results on
       NCS/EMG and MRI studies.  However, the undersigned notes that the restriction to
27

28

1     frequent handling and fingering in the above RFC is more restrictive over the course of a
2     workday than Dr. Santaniello's proposed work schedule.

3   AR 23.

4         The Court finds that the ALJ properly evaluated the persuasiveness of Dr. Santaniello's 2016

5   opinion by considering the factors of supportability and consistency.  First, the ALJ determined that

6   Dr. Santaniello's opinion was supported by the examination findings, including positive Tinel's test

7   bilaterally and tenderness to palpitation, but normal ROM (range of motion) in the bilateral hands,

8   and normal ROM and stability in the bilateral shoulders.  AR 23.  This reasoning invokes the

9   supportability factor, which means the extent to which a medical source supports the medical opinion

10  by explaining the "relevant ... objective medical evidence." *Id.* § 404.1520c(c)(1)."  *Woods*, 2022 WL

11  1195334, at * 6.  Second, the ALJ determined that Dr. Santaniello's opinion was consistent with the

12  overall treatment record, including positive tests for carpal tunnel and cubital tunnel syndrome, but

13  only mild results on NCS/EMG and MRI studies.  AR 23.  This reasoning invokes the consistency

14  factor, which "means the extent to which a medical opinion is 'consistent ... with the evidence from

15  other medical sources and nonmedical sources in the claim.' *Id.* § 404.1520c(c)(2)."  *Woods*, 2022

16  WL 1195334, at *6.  Plaintiff has not challenged the ALJ's evaluation of these factors.

17        Dr. Santaniello also reevaluated Plaintiff in March 2019.  AR 1226-1240, 1241.  On physical

18  examination, Plaintiff walked with a normal reciprocal gait. In her bilateral elbows, she had left

19  elbow tenderness over the medial epicondyle and incision and right elbow tenderness over the medial

20  epicondyle cubital tunnel.  Her range of motion was normal, but her Tinel's test was positive in both

21  elbows.  In her bilateral hands and wrists, Plaintiff had right hand and wrist tenderness over the dorsal

22  aspect right thumb and over the volar aspect of right wrist.  She also had left hand and wrist

23  tenderness over the first extensor compartment and tenderness over the CMC joint and volar aspect of

24  the left wrist.  Range of motion in her hands was normal, but she had limited extension and radial

25  deviation of the right wrist.  Phalen test, Tinel test and Dukan test were positive on her right and left

26  wrist.  AR 1233-35.

27        On April 16, 2019, as part of his evaluation report, Dr. Santaniello opined that Plaintiff's work

28  restrictions for the bilateral hands, wrists, and elbows would include no repetitive manipulation more

than 30 minutes with a 5-minute rest, no more than 4 hours in an 8-hour day, and no grasping, pushing, pulling, torquing, or lifting over 15 pounds.  AR 1239.

However, prior to that opinion, on April 10, 2019, Dr. Santaniello completed a Physician's Return-To Work & Voucher Report check-the-box form.  AR 1241.  Dr. Santaniello opined that Plaintiff could stand, walk, sit, bend, squat, climb, and twist 6-8 hours each, could not crawl, could reach, drive, grasp, and push/pull 2-4 hours each, but could not lift, push, pull, grasp or torque over 15 pounds.  AR 1241.

In considering these opinions, the ALJ reasoned as follows:

> The undersigned finds Dr. Santaniello's 2019 opinions not persuasive.  Dr. Santaniello offered somewhat differing opinions, one week apart, without explanation of the differences.  Nor did Dr. Santaniello explain the differences in work restrictions from 2017 to 2019, given the very similar examination findings.  These 2019 opined restrictions are less consistent with the immediate examination, and less consistent with the overall treatment record.  While the record shows subjective complaints of upper extremity pain and numbness, and special tests indicated that the claimant had carpal tunnel and cubital tunnel syndrome, the essentially normal neurological and skeletomuscular findings, normal ROM, normal strength, and mild results on NCS/EMG and MRI studies, are not consistent with a limitation to only four hours of repetitive manipulation in an eight-hour day, nor with limitations to occasional reaching, driving, grasping, or pushing/pulling.  Dr. Santaniello also does not explain his proposed limitation to 15 pounds for manipulative activities, given the stable exam findings.  Accordingly, these opinions are not persuasive.

AR 24.

The Court finds that the ALJ properly evaluated the persuasiveness of Dr. Santaniello's 2019 opinions by considering the factors of supportability and consistency.  First, the ALJ determined that Dr. Santaniello's opinion was less consistent with the current examination and lacked an explanation for the differing opinions offered one week apart or for the differences in work restrictions from 2017 to 2019, given the very similar examination findings.  This reasoning invokes the supportability of Dr. Santaniello's 2019 opinions, including whether Dr. Santaniello supported his restrictions with relevant objective findings or in reference to his previous findings and opinion.  20 C.F.R. § 404.1520c(c)(1).  Second, the ALJ determined that Dr. Santaniello's 2019 opinions were less consistent with the overall treatment record.  The ALJ also determined that the restriction to only four hours of repetitive manipulation or occasional was not consistent with record evidence of essentially normal neurological and skeletomuscular findings, normal range of motion, normal strength, and mild

17

results on NCS/EMG and MRI studies. AR 24.   This reasoning expressly invokes the consistency factor regarding the extent to which Dr. Santaniello's opinions were consistent with other medical evidence in the record.  20 C.F.R. § 404.1520c(c)(2).  Plaintiff has not challenged the ALJ's evaluation of these factors under the applicable regulatory framework.

Dr. Salvo

On July 2, 2020, Dr. Salvo completed a Residual Functional Capacity Questionnaire – CARDIAC form.  Dr. Salvo identified Plaintiff's diagnoses to include neurocardiogenic syncope, dysautonomia, POTS, and venous insufficiency.  He described Plaintiff's symptoms to include mental fogging, dizziness, fatigue and syncope.  He also identified positive objective signs to include nausea, chest pain, palpitations, dizziness, shortness of breath, edema and fatigue.  Dr. Salvo opined that Plaintiff had marked limitations of physical activity and her symptoms and limitations were impacted by depression and anxiety.  Dr. Salvo indicated that Plaintiff was incapable of even "low stress" jobs, and he expected her symptoms to interfere with the attention and concentration necessary to perform simple work tasks constantly.  AR 1456-57.

Dr. Salvo opined that Plaintiff could sit comfortably for 5 minutes or stand comfortably for 5 minutes before needing to lie down.  He further opined that Plaintiff could sit less than 2 hours in an 8-hour workday and stand and/or walk less than 2 hours in 8-hour workday.  Dr. Salvo indicated that Plaintiff must be able to lie down to avoid passing out/syncope and that she would require unscheduled breaks every hour to lie down.  With prolonged sitting, Plaintiff must elevate her legs above her head when she feels she is going to pass out for 20% of an 8- hour workday.  She would require additional unscheduled breaks 5 times for 60 minutes for her chronic fatigue, weakness, and syncope/dizziness.  AR 1458.  Dr. Salvo further opined that Plaintiff could rarely lift or carry less than 10 pounds and could rarely twist, stoop (bend), crouch, climb ladders or climb stairs.  She must avoid all exposure to extreme cold, extreme heat, fumes, odors, dusts, gasses, humidity, heights and hazardous machinery and must avoid moderate exposure to noise and wetness.  Dr. Salvo estimated that Plaintiff would miss more than four days per month on average.  Dr. Salvo indicated that Plaintiff's mental clouding associated with her disorder would make it very difficult to focus on tasks at hand.  AR 1459.

The ALJ considered Dr. Salvo's opinion and reasoned as follows:

These opined limitations are extreme, unsupported by Dr. Salvo's treatment records, and not consistent with the overall evidence of record.  In his most recent treatment visit before completing this opinion statement, Dr. Salvo noted in November 2019 that the claimant complained of severe fatigue, but had no interval change in her POTS disease, and still had good days and bad days.  He noted that her POTS was controlled on medication.  A physical exam was unremarkable, apart from trace non-pitting edema in the bilateral lower extremities (Ex. 46F/11-14).  In February 2020, he stated that she continued to have days of fatigue and dizziness, but no frank syncope, and had unremarkable exam findings (Ex. 46F/6).  In a May 20202 telehealth visit, the claimant complained of dizziness and presyncope, with a reported two episodes since her last visit.  (Ex. 46F/2.)  Even with increased presyncope episodes, the claimant only reported two episodes between February and May, and yet Dr. Salvo opined that the claimant would have to spend almost all day, every day lying down, to avoid passing out.  Dr. Salvo's treatment records note that the claimant regularly travels from Texas to California for treatment visits, which clearly requires both sitting and standing for more than five minutes at a time, and more than two hours in a day.  Prolonged standing would be likely when going through TSA security lines or checkpoints, or when waiting to board, or when waiting for luggage, if checked.  Also, the airplane ride itself would require prolonged sitting.  Furthermore, he has not treated the claimant for her upper extremity impairments, nor do his records show a review of records or functional testing that would support a limitation to only 10 pounds of lifting and carrying, or rare postural activities.  These opinions are not consistent with the overall treatment record, which shows good control of the claimant's cardiac symptoms with medication and only mild results on NCS/EMG and MRI studies.  Accordingly, these opinions are not persuasive.

AR 24-25.

The Court finds that the ALJ properly evaluated the persuasiveness of Dr. Salvo's opinion by considering the relevant factors of consistency and supportability.  20 C.F.R. § 1520c(b)(2).  First, the ALJ determined that Dr. Salvo's extreme opinion was not supported by his treatment records and objective findings, including no interval change in her POTS disease, unremarkable physical examinations, limited reports of syncope, but no frank syncope on examination, no treatment for upper extremity impairments and no functional testing for lifting, carrying or postural activities.  AR 24, 1388, 1392, 1394, 1397-1400. The ALJ also pointed out that Dr. Salvo's extreme standing and sitting limitations were not supported by notations in Dr. Salvo's own treatment records indicating that Plaintiff regularly traveled from Texas to California for treatment visits, which would require both sitting and standing for more than five minutes at a time.  AR 24, 1392, 1397.  Second, the ALJ determined that Dr. Salvo's opinion was not consistent with the overall treatment record, which

1   showed good control of Plaintiff's cardiac symptoms with medication, and only mild results on

2   NCS/EMG and MRI studies.  AR 25, 976-77, 1251-52, 1274, 1400.  Plaintiff has not challenged the

3   ALJ's evaluation of these factors.

4            The Court finds that Plaintiff has not challenged the ALJ's findings under the applicable

5   regulations,[6] and on that basis alone, the Court cannot conclude that the ALJ erred.  Moreover, under

6   the applicable regulatory framework, the Court finds the ALJ properly evaluated the persuasiveness

7   of the opinions rendered by Drs. Santaniello and Salvo.

8            **D.       Plaintiff's Subjective Complaints**

9            As a final matter, Plaintiff contends that the ALJ failed to give clear and convincing reasons

10   for rejecting her subjective complaints.   (Doc. 15 at 20.)  In deciding whether to admit a claimant's

11   subjective complaints, the ALJ must engage in a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995,

12   1014 (9th Cir. 2014); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

13   First, the claimant must produce objective medical evidence of her impairment that could reasonably

14   be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014. If

15   the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the

16   claimant's testimony regarding the severity of her symptoms only by offering specific, clear and

17   convincing reasons for doing so.  *Id.* at 1015.

18            Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be

19   expected to cause the alleged symptoms, but discounted her statements concerning the intensity,

20   persistence and limiting effects of those symptoms.  AR 17-18.  The ALJ was therefore required to

21   provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

22            The Court finds that the ALJ provided specific, clear and convincing reasons for discounting

23   Plaintiff's subjective complaints.  As one reason, the ALJ found that Plaintiff's statements about the

24   intensity, persistence, and limiting effects of her symptoms were inconsistent with the objective

25   medical evidence.  AR 17-18.  Although lack of supporting medical evidence cannot form the sole

---

[6] Although the Commissioner identified the relevant regulations in opposition to Plaintiff's opening brief, Plaintiff failed to address or otherwise acknowledge those regulations in her reply brief.  (Doc. 20 at 5.)

basis for discounting testimony, it is a factor that the ALJ can consider. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). In this instance, the ALJ agreed that the objective medical evidence and Plaintiff's testimony supported certain functional limits, including precluding her from performing heavy lifting, limiting her to work at the light level, limiting her to only frequent pushing, pulling, reaching, handling, and fingering bilaterally, limiting her to only occasional climbing of stairs and ramps, with no climbing of ladders, ropes, or scaffolds, or work at unprotected heights, and restricting her from exposure to loud noise, vibration, and atmospheric conditions. AR 26. However, the ALJ found that objective findings did not support totally disabling limitations resulting from her upper extremity impairments because she had a good result from surgery, with limited findings at her qualified medical examination, and mild results from NCS/EMG and MRI studies. AR 26, 683-705, 976-77, 1194, 1196, 1226-1240, 1251-52, 1274. Similarly, with regard to her POTS and dysautonomia, there were few reports of palpitations and no significant findings on examination. AR 26, 751-54, 756-57, 1392-94. With regard to her fibromyalgia, the ALJ noted that treatment records documented only 10/18 tender points, and 0/68 tender or swollen joints. AR 26; *see also* AR 1330-33, 1335-38, 1340-44.

Second, the ALJ considered that Plaintiff's impairments, including her POTS, dysautonomia, and migraine headaches were well controlled with medications. AR 22, 26, 1350-51, 1400. The ALJ properly relied on the fact that Plaintiff's impairments were controlled with medication in evaluating her symptom testimony. *See Smith v. Kijakazi,* No. 21-35625, 2022 WL 3714345, at *2 (9th Cir. Aug. 29, 2022) (finding ALJ properly relied on evidence that claimant could effectively manage her symptoms with medication and chiropractic treatment in rejecting her testimony); *Ervin v. Comm'r of Soc. Sec.*, No. 2:20-CV-1460-KJN, 2022 WL 4133135, at *7 (E.D. Cal. Sept. 12, 2022) (finding the fact that claimant's impairments could be controlled with medication a legally sufficient reason for the ALJ's decision on plaintiff's symptom testimony). Impairments that can be controlled effectively with medication are not disabling. *Warre v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Third, the ALJ cited Plaintiff's testimony that she had been able to fly back and forth between California and Texas unaccompanied on a regular basis. AR 26. A claimant's "out-of-state travels"

may "contradict[ ] her subjective complaints of pain and lack of mobility." *Beck v. Astrue*, 303 F. App'x. 455, 458 (9th Cir. 2008); *see also Hanes v. Colvin*, 651 F. App'x. 703, 705 (9th Cir. 2016) (holding that claimant's description of extreme pain was inconsistent with her description of her daily activities, which included cooking, cleaning, shopping, and traveling).  The ALJ noted that Plaintiff's regular travel would require sitting and standing for more than five minutes at a time and more than 2 hours in a day, reasoning that the airplane ride alone would require prolonged sitting.  AR 24. Additionally, the ALJ considered Plaintiff's testimony that she would inform the flight attendant and her seatmate of her medical issues and not to worry if she had a syncopal episode.  The ALJ did not find this testimony credible, concluding that such a report would routinely require a determination by the captain of whether Plaintiff would be allowed to fly and there is no indication that this was a regular occurrence.  AR 26.  The ALJ properly discounted Plaintiff's symptom testimony based on her reported ability to fly out-of-state alone on a regular basis.

For these reasons, the Court finds the ALJ's assessment of Plaintiff's subjective complaints free of reversible error.  Even if one of the reasons provided by the ALJ could be found inadequate, there are sufficient other reasons provided to support the assessment of Plaintiff's subjective complaints. *See Batson*, 359 F.3d at 1197.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff Pamela Marie Deacon.

IT IS SO ORDERED.

Dated:   **November 30, 2022**          /s/ *Barbara A. McAuliffe*
                                    UNITED STATES MAGISTRATE JUDGE